# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANET GARTLAND, | CASE NO. 3:13-cv-02668-GBC |
| Plaintiff, | |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| | MEMORANDUM |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | Docs. 1, 8, 9, 10, 11, 12, 14 |
| Defendant. | |

## MEMORANDUM

## I.    Procedural Background

On April 5, 2011, Janet Gartland ("Plaintiff") filed as a claimant for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34, with a date last insured of December 31, 2015,[1] and claimed a disability onset date of September 1, 2010. (Administrative Transcript (hereinafter, "Tr."), 24).

After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on May 17, 2012. (Tr. 42-72). On

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

May 24, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 21-41). On July 9, 2012, Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on September 24, 2013, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 4-10).

On October 29, 2013, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration denying social security benefits. (Doc. 1). On February 3, 2014, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings. (Doc. 8, 9). On March 20, 2014, Plaintiff filed a brief in support of the appeal. (Doc. 10 ("Pl. Brief")). On April 17, 2014, Defendant filed a brief in response. (Doc. 11 ("Def. Brief")). On April 29, 2014, the Court referred this case to the undersigned Magistrate Judge. Both parties consented to the referral of this case to the undersigned Magistrate Judge, and an order referring the case to the undersigned Magistrate Judge was entered on June 16, 2014. Doc. 14.

## II. Relevant Facts in the Record

Plaintiff was born September 11, 1958, and thus was classified by the regulations as a person closely approaching advanced age through the date of the ALJ decision on May 24, 2012. (Tr. 37); 20 C.F.R. § 404.1563(d). Plaintiff

completed the eleventh grade and obtained a GED. (Tr. 49-50). Plaintiff prior relevant employment includes working as a custodian at an airport from March 1995 to November 2010, which the vocational expert ("VE") described as heavy exertional unskilled work. (Tr. 37, 50, 67, 148). Plaintiff reported that after fifteen years of working at the airport she was fired in October 2010 and charged with receiving stolen property when she took a camera bag from the lost and found in an attempt to locate the owner. (Tr. 471). Plaintiff reported that she was serving eighteen months in an Accelerated Rehabilitative Program[2] for the offense. (Tr. 60, 471).

## A. Relevant Treatment History and Medical Opinions[3]

### 1. CHS Professional Practice: Emil Dilorio, M.D.; Thomas Merkel, L.P.T.

On June 17, 2005, June 24, 2005, and June 27, 2005, Plaintiff followed-up regarding left shoulder pain as a result of a work-related injury on June 10, 2005. (Tr. 190-97). Plaintiff reported repetitive motion with her left shoulder of lifting fifty to sixty garbage bags three times a day that weight at most twelve pounds.

---

[2] "'Accelerated Rehabilitative Disposition' . . . program . . . permits expungement of the criminal record upon successful completion of a probationary term." *Gilles v. Davis*, 427 F.3d 197, 202 & n.9 (3d Cir. 2005); Pa. R. Crim. P. 312.

[3] Plaintiff acknowledges in the Reply Brief that she submitted medical records after the ALJ's May 2012 decision. Reply Brief at 4-5. Plaintiff has not asserted any cause, much less good cause, for failing to obtain the medical opinion prior to the ALJ decision. In *Mathews,* the Court held that there was no good cause for the omission of an opinion created after the ALJ decision when the opinion could have been created before the ALJ decision. *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). Thus, the Court did not consider the opinions and records submitted after the ALJ's decision and does not recommend remand pursuant to Sentence Six.

(Tr. 196).  Dr. Dilorio reviewed an MRI and found no evidence of rotator cuff tear and noted mild bursitis.  (Tr. 191, 198).  Dr. Dilorio indicated that Plaintiff could return to modified work, restricting her from lifting up to ten pounds while sitting and from lifting above the shoulder from June 17, 2005, to July 4, 2005.  (Tr. 190, 193, 195, 197).

Dr. Dilorio referred Plaintiff for physical therapy to address her left shoulder, and in a discharged report dated August 23, 2005, Mr. Merkel stated that he treated her four times and because she had not returned since July 2, 2005, they would discharge her.  (Tr. 199).

## 2.  Lehigh Valley Hospital

In medical record dated May 19, 2008, Plaintiff reported a history of anxiety, depression and dizziness.  (Tr. 251, 259).  On June 9, 2008, Plaintiff sought hospital treatment for reported lightheadedness, chest pain, and upper extremity numbness.  (Tr. 209, 218).  Plaintiff reported that in the last month she had three similar episodes that lasted one to two hours and associated with near syncope.  (Tr. 209).  Plaintiff stated that she was watching television when the most recent episode occurred.  (Tr. 209).  Plaintiff was diagnosed with "noncardiac chest pain" and anxiety disorder.  (Tr. 209).  Her medications included Clonazepam, Lipitor, Singulair, Wellbutrin, and Nasacort. (Tr. 213).

///

### 3.  Muhlenberg Behavioral Health: Susan Matta, D.O.

On February 4, 2010, Plaintiff reported that she still gets depressed two days per month and still experiences occasional dizzy spells and sleeping ten hours at night.  (Tr. 274).  Plaintiff reported poor energy, fair concentration and eating too much.  (Tr. 274).  Dr. Matta noted unremarkable findings.  (Tr. 27).

On June 3, 2010, Plaintiff reported feeling very depressed, sleeping ten hours a day, eating too much, having gained thirty pounds, and with poor energy and concentration.  (Tr. 272).  With the exception of a depressed mood, Dr. Mata noted unremarkable findings.  (Tr. 272).

On June 14, 2010, Plaintiff called and reported that since the medication chance, she was getting very dizzy and stated that she discontinued Pristiq on her own because it was causing too much weight gain and that was making her depressed.  (Tr. 271).  Plaintiff stated that she believed Wellbutrin was causing the dizzy spells because thirty minutes after she takes it, she experiences a dizziness that is different from the other dizzy spells that she gets.  (Tr. 271).  Plaintiff reported that the Klonopin did not help the dizziness attributed with Wellbutrin, but helped with her other dizziness.  (Tr. 271).  She was educated about making medicine changes on her own and encouraged to call before making changes to her medicines in the future.  (Tr. 271).

On July 8, 2010, Plaintiff reported feeling less depressed since starting Cymbalta and energy and concentration are good. (Tr. 269). Upon evaluation Dr. Matta observed that Plaintiff's though process, though content, perception, insight, judgement, memory, and cognition were within normal limits. (Tr. 269).

On September 23, 2010, Plaintiff reported feeling less depressed since starting Cymbalta but that Ambien did not alleviate her problem with sleeping. (Tr. 264). Plaintiff reported that she was feeling much more anxious, however her energy and concentration were good. (Tr. 264). Upon evaluation Dr. Matta observed that Plaintiff's though process, though content, perception, insight, judgement, memory, and cognition were within normal limits. (Tr. 264).

For Plaintiff's medical history it was noted that Plaintiff had suffered from depression for the past twenty years, and for five years Wellbutrin was effective until recently, she attributed it to causing dizziness. (Tr. 264). Plaintiff reported that her previous medications caused side effects which included: 1) Paxil caused vomiting; 2) Effexor caused weight gain and hair to fall out; 3) Wellbutrin stopped working and caused dizziness; and, 4) Pristiq caused weight gain. (Tr. 264). Plaintiff reported that her daughter was back in jail, and Plaintiff was upset because she could not see her grandchildren anymore. (Tr. 264). Dr. Matta gave Plaintiff a note that she could not work from July 2, 2010 to July 12, 2010. (Tr. 264).

## 4. Slate Belt Family Practice: Wayne J Brotzman, D.O.

Plaintiff has sought treatment for anxiety and alleged "undiagnosable" chronic vertigo since August 1998. (Tr. 276-426, 605-06). Records show that Plaintiff received weekly allergy injections. *E.g.* (Tr. 278-88).

On January 8, 2000, Plaintiff called for a work excuse. (Tr. 303). On January 3, 3001, Plaintiff reported cold symptoms and impression was "[p]robable bronchitis vs. walking pneumonia." (Tr. 303). On June 19, 2001, Plaintiff made a routine visit regarding her "chronic anxiety." (Tr. 303). Plaintiff reported that the medication regimen that she has been on for over a year is managing her symptoms effectively without any side-effects. (Tr. 303). Dr. Brotzman opined that the anxiety was well controlled.

On April 5, 2000, Plaintiff sought treatment for acute seasonal allergy symptoms. (Tr. 304). Examination revealed rhinorrhea, but otherwise unremarkable. (Tr. 304). On June 2, 2000, Plaintiff sought treatment for an ear infection. (Tr. 304). On August 31, 2000, Plaintiff requested weight loss medication and complained of toe pain. (Tr. 304).

On December 28, 2001, Plaintiff reported that her anxiety was managed by the medications and that she "knows that if she starts getting dizzy that . . . is here anxiety." (Tr. 301). Plaintiff reported that she experienced no side-effects. (Tr.

301). Impression listed "chronic anxiety." (Tr. 301). On January 7. 2002, Plaintiff called in for a doctor's note. (Tr. 301).

On June 19, 2002, Plaintiff reported that her anxiety was well managed by medications. (Tr. 300). On December 31, 2002, Plaintiff reported that her medication managed Plaintiff's anxiety well and she had no complaints or problems. (Tr. 299).

Visit on June 6, 2003, was unremarkable. (Tr. 298). On September 30, 2003, Plaintiff reported chest congestion, wheezing and coughing, but without a fever. (Tr. 297). Physical exam revealed a persistent non-productive cough, inflamed nasal turbinates, and lungs that were rhonchitic with "wheezing in all quadrants with deep breathing triggering non-productive cough. (Tr. 297). Impression listed: 1) acute bronchitis with probable RAD; 2) history of smoking with possible COPD; 3) upper respiratory infection. (Tr. 297).

On September 12, 2003, Plaintiff sought treatment for nasal congestion, reporting that she has tried Claritin, Zyrtec, and other OTC cold medications without relief. (Tr. 297). Examination revealed "severe nasal turbinate hyperemia and swelling with right septal deviation" and mild "inflammation of the posterior pharynx and a cobble stoned appearance without exudate, adenopathy, stridor or hoarseness." (Tr. 297). The impression listed: 1) allergic rhinitis; 2) hyperlipidemia; 3) anxiety. (Tr. 297).

On March 11, 2004, Plaintiff reported doing well, "[n]o anxiety outbreaks at all." (Tr. 296). Physical examination was normal. (Tr. 296). On September 20, 2004, Plaintiff reported fatigue and common cold symptoms. (Tr. 296). Assessment revealed a viral upper respiratory infection and escused Plaintiff from work for two days. (Tr. 296).

On January 10, 2005, Plaintiff reported that Zoloft and Serax were managing her symptoms very well. (Tr. 295). Plaintiff reported "no side effects, weight intolerance or any problems whatsoever." (Tr. 295). Physical examination was unremarkable. (Tr. 295). On April 19, 2005, Plaintiff called in for a doctor's note due to stomach pain. (Tr. 294). On June 9, 2005, Plaintiff reported sinus congestion and itchy eyes. (Tr. 294). Plaintiff had been using Claritin without complete relief. (Tr. 294). Physical exam revealed "increased lacrimation but no matting or crusting" and that "[n]asal turbinates [were] very inflamed but there was no obstruction, facial tenderness, swelling or regional adenopathy." (Tr. 294).

On November 18, 2005, Plaintiff reported increased anxiety and stress due to her care of her ill parents. (Tr. 293). Plaintiff was "distraught" as she reported of her parents continual decline in health. (Tr. 293). Plaintiff reported that she is unable to perform her work duties due to her distractibility and has difficulty sleeping and eating. (Tr. 293). Plaintiff had been tacking Zoloft and Serax daily and reported the increase in Serax helped with anxiety helped. (Tr. 293).

However, Zoloft, which she had been on for five to six months, produced unacceptable sexual side effects. (Tr. 293). Her treating physician replaced Zoloft with Wellbutrin XL daily. (Tr. 293). Her treating physician noted "She has quite a lot on her plate right now including two sick parents and feels that she is going to be unable to work. I did not dispute this and I have given her a note excusing her from work." (Tr. 293).

On December 8, 2005, Plaintiff reported "[n]o side effects whatsoever from the Wellbutrin but she feels less than complete relief with her anxiety." (Tr. 293). Plaintiff reported continued difficulty sleeping, was emotionally labile, and experiencing excessive stress from her ill parents. (Tr. 293). Counseling was again suggested. (Tr. 293).

On January 18, 2006, Plaintiff reported doing fairly well during the day and no further side effects since increasing the Wellbutrin. (Tr. 292). Plaintiff reported that her main problem was an inability to stay as1eep at night. (Tr. 292). On June 30, 2006, Plaintiff reported that her medications were updated by her psychiatrist and that her mother and father died within six weeks. (Tr. 291). Plaintiff stated that she had been very anxious during this time but felt like she was getting back on her feet. (Tr. 291). Physical and mental exam findings were unremarkable. (Tr. 291). Mental and physical examination revealed She has some rhinorrhea and postnasal drainage without nuchal rigidity or stridor, no tracheal deviation, regular

heart, and clear lungs. (Tr. 291). Plaintiff seemed "to be in much better control of her emotions today but readily admits to still feeling very anxious particularly at night. She has been able to get through her days okay." (Tr. 291). Plaintiff was assessed with anxiety, stress, and allergic rhinitis. (Tr. 291). Plaintiff was referred to mental health counseling. (Tr. 291).

On October 17, 2006, Plaintiff was assessed with a viral upper respiratory infection. (Tr. 291). On December 8, 2006, Plaintiff called for a doctor's note since she missed work due to not feeling well. (Tr. 291). In a note dated December 11, 2006, Plaintiff called stating that she stayed out from work in order to "hydrate herself" and needed a doctor's note. (Tr. 290). On January 16, 2007, it was noted that nasal decongestion treatments such as Afrin, Saline nasal sprays, OTC antihistamine decongestants, prescription decongestants, and Nasacort have not worked. (Tr. 290). Upon examination it was noted that Plaintiff had what appeared to be a "nasal polyp obstructing the right nares." (Tr. 290).

On April 10, 2007, Plaintiff reported lightheadedness when she exercised and reported no other symptoms. (Tr. 289). Plaintiff reported feeling much better after having had sinus surgery last month and is currently off antihistamines. (Tr. 289). Physical examination was unremarkable and mental status examination revealed that Plaintiff significantly "improved over previous visits," seemed to have gained a lot more self-confidence, and has been taking her healthcare, diet

and exercise program very seriously.  (Tr. 289).  On July 23, 2007, Plaintiff reported profound fatigue and stated that it has lasted for most of the past year.  (Tr. 288).  Examination findings were unremarkable.  (Tr. 288).

On January 24, 2008, Plaintiff reported feeling more depressed from quitting smoking.  (Tr. 286).  On February 19, 2008, Plaintiff reported improvement due to the medication and did not report any side-effects.  (Tr. 285).  On April 9, 2008, Plaintiff reported experiencing several episodes of dizziness and lightheadedness which start abruptly usually while at work.  (Tr. 285).  Plaintiff was "very clear this [was] unassociated with nausea, vomiting, blurred vision or syncope."  (Tr. 285).  Plaintiff reported that she did not experience any chest pain or palpitations and the dizziness episodes had no relationship to eating or fasting or any certain activity.  (Tr. 285).  However, Plaintiff reported that Clonazepam alleviates the symptoms.  (Tr. 285).  Examination revealed normal findings.  (Tr. 285).

On June 7, 2008, Plaintiff reports that her "near syncopal episodes" continue where she gets a "vague visual disturbance" followed by extreme lightheadedness, abrupt vertigo, "but no true syncope."  (Tr. 283).  Plaintiff reported that these symptoms would occur without any pattern or anything appearing to trigger the symptoms, such as food or activity.  (Tr. 283).  Plaintiff reported not experiencing any headaches.  (Tr. 283).  On June 25, 2008, Plaintiff reported that her anxiety was still very bad and that she has had vertigo going back for years.  (Tr. 283).

The treatment provider wrote "I cannot help but wonder and I discussed this with her if her anxiety is tied to her vertigo. There is no way to prove it. I do have a reasonable suspicion that the two might be related. She is open to trying any option and I am going to switch her from Wellbutrin to Effexor XR . . . ." (Tr. 283).

A note dated September 3, 2008, stated that Plaintiff was suffering stress due to her son-in-law stealing grandchildren from her daughter. (Tr. 282). On September 17, 2008, Plaintiff reported that Effexor caused too many side-effects of hair loss, weight gain, and sexual dysfunction. (Tr. 282). Plaintiff reported that she was currently in counseling and waiting to see a psychiatrist. (Tr. 282).

On December 1, 2008, Plaintiff reported reoccurrence of dizziness. (Tr. 281). Plaintiff reported that about six months ago she saw an ENT specialist and testing proved inconclusive. (Tr. 281). Plaintiff was put on Valtrex to address dizziness and it was noted that she was never prescribed motion sickness medication or Meclazine. (Tr. 281). Plaintiff reported being off antidepressant and anti-anxiety medication for "quite some time" and reports her anxiety is worsening stated that the anxiety does not aggravate her symptoms. (Tr. 281). Plaintiff reported occasional numbness and tingling on her hands and feet with these dizzy episodes but no vomiting or blurred vision. (Tr. 281). Examination revealed normal findings and the impression was "[i]ntermittent episodes of dizziness which is chronic and recurrent and refractory" and anxiety. (Tr. 281).

On December 15, 2008, Plaintiff reported some improvement with her dizziness symptoms while on the recently prescribed Prestiq, however, the chronic vertigo is the same. (Tr. 281).

On March 1, 2010, Plaintiff reported that she had not actual dizziness, just a feeling of sporadic lightheadedness and fatigue for the last couple of months. (Tr. 279). Dr. Brotzman considered that symptoms could be due to side-effects of medications, but Plaintiff stated that the symptoms not due to the medication. (Tr. 279). Examination findings were was unremarkable. (Tr. 279). In a treatment note dated March 17, 2010, it was noted that Plaintiff's urine was "obviously grossly hematuric" and was given a work excuse for the day. (Tr. 278). On September 1, 2010, had a mostly unremarkable examination that concluded with the impression of hyperlipidemia and anxiety. (Tr. 278).

On February 10, 2011, examination results were unremarkable. (Tr. 428). On November 10, 2011, it was noted that Plaintiff briefly had went to other physicians because of insurance but was very dissatisfied and made arrangements to return Slate for care. (Tr. 576). Examination results were unremarkable. (Tr. 576).

///

///

**5. Otorhinolaryngology Associates: Eric Holender, D.O.; Maria Slig, P.A.C.**

On January 24, 2007, sought treatment for nasal congestion and nasal polyps. (Tr. 411-12). It was noted that she quit smoking in November 2006. (Tr. 411). Dr. Holender ordered a CT scan to determine the nature and extent of the polyp which revealed soft tissue thickening (compatible with polyps) and a deviated nasal septum. (Tr. 409, 412, 541). Plaintiff underwent endoscopic sinus surgery and septoplasty in March 2007. (Tr. 408, 542). Dr. Holender made benign findings and Plaintiff did well generally post-surgery through 2009. (Tr. 371, 376-77, 392, 399-405, 448).

On June 23, 2008, Plaintiff reported episodes of imbalance that began in April. (Tr. 376). A CT scan of her brain was normal. (Tr. 356). Plaintiff underwent a videonystagmography (VGN) balance function study and the results were normal (Tr. 525-35). In a Videonystagmography ("VNG") test report dated July 11, 2008, Plaintiff reported that her dizzy episodes had decreased since taking an anti-viral medication and VNG test results were within normal limits. (Tr. 525).

On March 16, 2009, Plaintiff came for a six-month allergy check and she had no sinus infections and medication reasonably controlled symptoms with exception of some itching eyes and skin. (Tr. 448). On September 16, 2009, at Plaintiff reported that her monthly injections are no longer helping her allergy

symptoms, her congestion was worsening, and very itchy eyes. (Tr. 450). Plaintiff had tried Allegra, Singulair, and a nasal steroid without much improvement of symptoms. (Tr. 450). Plaintiff did not experience any headaches or sinus infections. (Tr. 450). Ms. Slig assessed Plaintiff with rhinitis due to pollen. (Tr. 450).

On January 6, 2010, Plaintiff sought treatment for increased allergy symptoms which included increased itchy eyes, postnasal drip, and congestion. (Tr. 452). Plaintiff had no sinus pressure or pain and reported that she was around pets and "other things" during the holidays that she is normally not around. (Tr. 452). Plaintiff reported feeling a little lightheaded at times for three days but no tinnitus, hearing change, or vertigo. (Tr. 452). Plaintiff was on her allergy injections and daily Singulair prescription and not currently using saline rinses or nasal steroid sprays. (Tr. 452). Plaintiff reported that her asthma flares up very rarely but she keeps an albuterol inhaler in case she needs it. (Tr. 452). Examination was generally unremarkable and Plaintiff was assessed with upper respiratory infection. (Tr. 452). Ms. Slig believed that Plaintiff's "increased [post nasal drip] and eye itching [were] due to the different exposures she had over the holiday weeks" and her lightheadedness may have been due to a viral upper respiratory infection. (Tr. 452).

On March 30, 2011, Plaintiff sought treatment for congestion and reported that she had been having severe asthma and allergy problems. (Tr. 454). Plaintiff reported that she had been taking Benadryl and Zyrtec daily along with a decongestant spray for the sinuses daily for the past four months. (Tr. 454). Plaintiff had not been seen by any doctor in the past four months. (Tr. 454). Plaintiff stopped the allergy injections last year because she believed the injections were not working and she stated that she stopped uses a Proventil inhaler daily. (Tr. 454). Dr. Holender noted that Plaintiff was not currently working and it is difficulty to pay for medications. (Tr. 454). Upon examination, Dr. Holender determined Plaintiff had polyps in her nasal cavity and stated "recurrent polyp disease and most likely sinobronchlal syndrome." (Tr. 455-56).

On April 11, 2011, Plaintiff reported significant improved of symptoms due to the medication, was able to breathe well, and have not had a recent asthma attack. (Tr. 457). Plaintiff was able to smell and had restarted Singulair which was covered through her insurance. (Tr. 457). Upon evaluation Dr. Holender observed some improvement in the number and size of the nasal polyps, however, there was thick white pus draining from the area of the maxillary sinus. (Tr. 458).

### 6. Consultative Examination: Natalie Paul, Psy.D.

On June 6, 2011, Dr. Paul observed that "[a]t one point she picked up her left arm to demonstrate how she needs to move it because of the pain" but that

there "were no observable pain behaviors accompanying her movements." (Tr. 470). Plaintiff reported a longstanding history of anxiety, depression, and panic symptoms which have worsened over the past year. (Tr. 470). Plaintiff reported having "attacks" involving sudden unpredictable anxiety symptoms, vertigo, nausea, chest pain, shortness of breath, heart palpitations which last sometimes up to an hour. (Tr. 470). Plaintiff stated that she took Klonopin when the symptoms begin but there was no relief. (Tr. 470). Plaintiff reported that she had read on the internet about breathing techniques which she has tried, without benefit. (Tr. 470).

Plaintiff reported that she stays home in order to avoid having an attack in public. (Tr. 470). In the past, she has had to leave early from work and had recently restricted her usual activities because of her symptoms. (Tr. 470). Plaintiff reported that she could 'barely use' her left arm, because of an old repetitive movement injury which never fully resolved. (Tr. 470).

According to Plaintiff, the arm injury and recent back problems exacerbate her stress about being unemployed, leaving her feeling "limited jobwise" which exacerbates her current anxiety symptoms. (Tr. 470). Plaintiff had been seeing Dr. Susan Matta at Muhlenberg Behavioral Health for psychiatric treatment over the past several years and current medications include: Klonopin 1 mg BID as needed, Ambien 10 mg 1-2 as needed for sleep, Cymbalta 30 mg in the morning, and Lipitor 10 mg once a day. (Tr. 470).

Plaintiff denied any inpatient psychiatric treatment. However, reported that in September 2010, she went to the ER in response to panic symptoms and she had a cardiology workup which was negative. Dr. Paul noted that there are no records to review regarding this incident. Dr. Paul noted that records indicate treatment by Dr. Susan Matta from Muhlenberg Behavioral Health who diagnosed her with Depressive Disorder NOS most recently on September 23, 2010. (Tr. 470). Plaintiff had participated in several brief courses of psychotherapy treatment over the years but she reported that has not gained much benefit. (Tr. 470). Plaintiff does not remember the names of prior therapists and in general does not have an interest in therapy to help with her problems. (Tr. 470).

Plaintiff reported that she quit smoking cigarettes after having a pack a day smoking habit since the age of eleven. (Tr. 470). Plaintiff reported rare alcohol consumption and no history of illegal drug use or experimentation. (Tr. 470-71). Plaintiff denied any history of inpatient or outpatient abuse treatment. (Tr. 471). Plaintiff reported living alone since her second husband of eighteen years moved out of the house because of her problems. (Tr. 471). Plaintiff was recently receiving medical assistance and was now able to pursue treatment for her shoulder injury and back problems in addition to her anxiety. (Tr. 471). Plaintiff reported that she is hoping to reconcile with her husband because they had a good marriage

until recently when he 'can't take it anymore ... to see (her) sitting around crying all day, doing nothing.' (Tr. 471).

Plaintiff reported that in October 2010, after fifteen years of service, Plaintiff was fired from her job as a custodian from the local airport. (Tr. 471). Plaintiff explained that she was charged with receiving stolen property when she took a camera bag from the lost and found in an attempt to locate the owner. (Tr. 471). At the time of the examination she was serving eighteen months of probation for that offense although her employment union is fighting the case for her. (Tr. 471).

Plaintiff reported that she had prior problem with her supervisor at the airport and believed they were looking for a reason to fire her since in 1998 she filed and won a lawsuit against her supervisor for sexual harassment and her supervisor was fired at the time as a result. (Tr. 471). Plaintiff reported that she last worked in December 2010 as a cashier for two months for seasonal employment which ended. (Tr. 471). Plaintiff reported that she earned her GED after quitting school in tenth grade to give birth to her daughter when she was sixteen-years-old. (Tr. 471). Plaintiff stated that she received special instruction but does not remember exactly for what. (Tr. 471). Plaintiff reported that out of her three grown children, she talks with only her youngest on a regular basis. (Tr. 471). Plaintiff reported that she sees her older brother once a week. (Tr. 471). Plaintiff reported that four years ago, she injured her left shoulder secondary to

repetitive lifting at work and went to physical therapy until she could no longer balance her work schedule to accommodate her appointments. (Tr. 471). Plaintiff believed she may be developing fibromyalgia.

Upon Examination Dr. Paul observed that Plaintiff:

remained attentive, alert and was found to be oriented in all spheres, able to recount her personal history, recent events and her childhood without difficulty. She knew the current president and the one before him. She could follow a 3 step verbal instruction without difficulty. Her speech was spontaneous, relevant and goal directed. Her thoughts were somatically focused. Auditory and or visual hallucinations were denied. Attention was within normal limits.

Concentration was mildly impaired. She recalled 6 digits forward, 3 backward and made errors during serial subtraction of 3 from 20 and did not recognize it. Delayed verbal recall of 4 words after 10 minutes was mildly impaired. She made errors on mental calculations but performed in the low average range. Interpretations of simple proverbs were inaccurate and concrete. She could find
similarities between word pairs involving abstract concepts. Judgment in imagined social situations was within normal limits.

Her mood appeared severely depressed, anxious and tearful. Her affect appeared appropriate, reduced in range and of normal intensity. She feels hopeless and helpless about her overall health and current situation. Suicidal ideation was denied. She denied any history of self injurious behavior. However, she scratches herself "without knowing it" when anxious. She has gained 45 pounds over the past 2 years. Her main goal is to "get myself back together again . . . to get treatment for my health ... so (she) can look for work."

(Tr. 472). Dr. Paul diagnosed Plaintiff with mood disorder NOS, by history and panic disorder with agoraphobia. (Tr. 472). Dr. Paul assessed Plaintiff

with a GAF score of 51.  As to Plaintiff's prognosis, Dr. Paul explained that she:

> presents with mild concentration and memory problems and concrete reasoning in addition to severe anxiety and moderate depression in response to her physical, social and work situation. She has a longstanding history of anxiety, depression and panic symptoms which have worsened over the past year. Her physical condition appears to be complicating her recovery potential and exacerbating her condition. Ongoing psychiatric and psychological treatment would be necessary in order to stabilize her symptoms and prevent further deterioration. Therefore, her prognosis appears guarded at this time.

(Tr. 472).  Dr. Paul concluded that Plaintiff appeared capable of managing her own benefits and finances.  (Tr. 473).

### 7.  The RedCo Group Behavioral Health Services: Susan Perry, M.S.[4]

In a record dated August 8, 2011, plaintiff reported that she suffered from panic attacks and had one in the last two weeks.  (Tr. 548).  Panic attacks occurred at night and dizziness is the first physical sign.  (Tr. 548).  Plaintiff reported feeling tired all of the time, decreased motivation, sleeping thirteen hours for three to four times a week, overeating, experiencing difficulty falling to sleep due to racing thoughts, and her husband moved out six months prior due to Plaintiff's mental illness.  (Tr. 548).

For treatment history, Plaintiff reported that she did outpatient therapy fifteen years prior; in 2007 Dr. Levinson did medication management, but there

---

[4] The assessment is signed by three individuals, including one that is a psychiatrist.  (Tr. 553). However, only Ms. Perry's name is legible.

were side-effects; in 2008 Dr. Matta treated Plaintiff but stopped in September 2010 due to insurance issues it was difficult to get refills until as recently as last month and Dr. Matta refiled for one month because primary care physician was not willing to prescribe the medication.  (Tr. 548).  Plaintiff reported arthritis in the right hand, left arm stiffness, and that she took over the counter medication to alleviate joint pain.  (Tr. 549-50).

Plaintiff reported that she last worked in January 2011 in seasonal retail and before that, she had worked for fifteen years as an airport custodian and was fired for stealing, though it was unfounded.  (Tr. 550).  Plaintiff reported that she did Bingo twice a week, used to sew and, in general, activities were difficult to engage in due to arthritis.  (Tr. 550).  Plaintiff reported that of her three grown children, she has not spoken to two of them in two years.  (Tr. 551).  Plaintiff reported that she has friends and goes to lunch with her friends.  (Tr. 551).

Examination revealed that Plaintiff's facial expression suggested slight anxiety and marked depression or sadness.  (Tr. 252).  Plaintiff denied any current or prior history of suicidal or homicidal ideation.  (Tr. 252).  Diagnosis was major depressive disorder and Plaintiff was assessed with a GAF score of 55.  (Tr. 253).

It was opined by Ms. Perry, a psychologist, and a therapist that Plaintiff had occasionally impaired: 1) attention span or concentration; 2) ability to manage daily living activities; ability to make reasonable life decisions; 3) memory.  (Tr.

554).  It was also noted that Plaintiff had a marked amount of racing thoughts.  (Tr. 554).

### 8.  Dr. Kim Rehabilitation: James B. Kim, D.O.

In a letter dated September 19, 2011, Dr. Kim rights that Plaintiff sought treatment for left shoulder trapezius pain.  (Tr. 572).  Plaintiff reported that she had experienced the pain for quite a while, was treated with therapy, and was living with her condition.   (Tr. 572).   Plaintiff reported that recently, she had been noticing hand pain and swelling for about one year and that she has been dropping items.   (Tr. 572).   Plaintiff reported experiencing numbness in the hands and fingers predominantly the lateral aspect of the hands.  (Tr. 572).  Plaintiff stated that when she is working part-time as a cashier, she noticed she has difficulty picking up things, holding a broom, and was dropping coins.  (Tr. 572).

Dr. Kim observed that Plaintiff was "independent in ambulation as well as activities of daily living."  (Tr. 753).  For mental status, Dr. Kim observed that Plaintiff was alert and oriented to person, place and time with spontaneous speech fluent without paraphasic errors.  (Tr. 753).  Dr. Kim opined that Plaintiff had normal auditory comprehension and was able to give detailed medical history without difficulty.  (Tr. 753).  Spinal examination revealed that Plaintiff had "tenderness and spasms in the left trapezius regions."  (Tr. 753).

For the motor examination of both upper extremities Dr. Kim observed:

> Normal bulk and tone. Muscle strength is 5/5 grading in the shoulder abductors, flexors, extensors, internal rotators and external rotators. Muscle strength is 5/5 in the elbow flexors and extensors. Bilateral grips are 4/5 strength. Finger abductors are 4/5 in strength bilaterally. There is some fullness or effusion in the MCP joints bilaterally. She has a negative Tinel sign. She has positive Phalen's test and positive reverse Phalen's test at both wrists.

(Tr. 753). Fir the motor examination of Plaintiff's lower extremities Dr. Kim observed:

> Normal bulk and tone. Muscle strength is 5/5 grading in the hip flexors, extensors, internal rotators, external rotators as well as abductors and adductors. Muscle strength is 5/5 in the knee flexors, extensors and ankle dorsiflexors, plantar flexors, invertors, and evertors. Full active as well as passive range of motions in all of the above joints and planes of motion and no tremor. Heel-to-shin is intact bilaterally. Straight leg raising is negative to about 70 degrees bilaterally.

(Tr. 573). For deep tendon reflexes Dr. Kim observed that "[b]rachioradialis are 2+ bilaterally, biceps are 2+ bilaterally, triceps ·are 2+ bilaterally, knee reflexes are 2+ bilaterally, ankle jerks are 2+ bilaterally, plantar reflexes are bilaterally flexus and no ankle clonus." (Tr. 573). Dr. Kim also observed that Plaintiff had "mild diminished pinprick sensation in the right medial hand compared to the left hand. (Tr. 573). Dr. Kim observed that Plaintiff was ambulating without any assistive devices or gait deviation. (Tr. 574). Dr. Kim concluded with her impression of: 1) bilateral hand pain, dysfunction and numbness with findings suggestive of bilateral carpal tunnel syndrome; 2) Physical findings of weakness suggestive of arthritis in both hands; 3) left trapezius myofascial pains; 4) history of severe depression; 5)

history of hypercholesterolemia; and, 6) history of environmental allergies. (Tr. 574).

On October 24, 2011, Dr. Kim noted that Plaintiff had an EMG which confirmed mild carpal tunnel syndrome of the upper right extremity. (Tr. 557). Plaintiff reported that she was not able to afford the hand splint yet. (Tr. 557). She had an X-ray of both hands and wrists which showed varying degrees of osteoarthritis. (Tr. 557). Plaintiff reported working part-time at a gas station. (Tr. 557). Plaintiff reported experiencing left trapezius pain and did not recall any recent activity to cause the pain other than pulling laundry at home. (Tr. 557).

Examination revealed: 1) tenderness and spasms predominantly in the left trapezius region; 2) muscle strength that was 5/5 in bilateral shoulder abductors, flexors, extensors, elbow flexors and extensors; 3) bilateral grips were 4+/5 in strength; 4) bilateral finger abductors were 4+/5 in strength; 5) muscle strength is 5/5 in bilateral hip flexors, extensors, knee flexors, extensors and ankle dorsiflexors. (Tr. 557). Dr. Kim noted that Plaintiff was ambulating without any assistive devices or gait deviation. (Tr. 557). Dr. Kim's impression included: 1) left trapezius myofascial pains; 2) bilateral hand pains, dysfunction and numbness with symptoms of bilateral carpal tunnel syndrome and EMG evidence of right carpal tunnel syndrome; 3) bilateral hands and wrist osteoarthritis; 4)

hypercholesterolemia; 5) environmental allergies; 6) history of severe depression. (Tr. 557).

### 9. Consultative Opinions: John Rohar, Ph.D.; Louis B. Bonita, M.D.

On June 8, 2011, Dr. Rohar, a psychological consultant who worked with the State agency, reviewed Plaintiff's file. (Tr. 77-81). Dr. Rohar opined that Plaintiff could perform simple, routine work. (Tr. 79-81). Dr. Rohar found that Dr. Paul relied heavily on Plaintiff's subjective report of symptoms and limitations, and over-stated her limitations that were unsupported by the totality of the evidence. (Tr. 79, 81). These findings were reviewed by Dr. Bonita on June, 9, 2011. (Tr. 77, 82). Drs. Rohar and Bonita opined that Plaintiff's asthma and anxiety disorder were not severe impairments. (Tr. 77).

### III.    Review of ALJ Decision

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v.*

*Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995)), and may be less than a preponderance. *Jones*, 364 F.3d at 503. If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits.  20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428.  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed.  20 C.F.R. § 404.1520(a)(4).  The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work.  20 C.F.R. §§ 404.1520, 416.920.  Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The claimant bears the burden of proof at steps one through four.  *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir.1993).  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Id.*  The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

## A. Step Two

Plaintiff argues that the ALJ erred by not concluding that Plaintiff's vertigo and her asthma were severe impairments. Pl. Brief at 7-10. Plaintiff states that:

> The ALJ unfortunately all but ignores one of [Plaintiff's] most difficult impairments, which is transient vertigo (also described as dizziness and lightheadedness). Her vertigo condition caused her to leave work, miss work, have episodes at work, and indeed did cause an inpatient hospitalization in 2008. While this hospitalization is outside the relevant time period, [Plaintiff's] cumulative record is available to the court, so that it is clear that her medical problems have been ongoing for years.
> …
> The ALJ did not believe that she falls, because he could not locate substantiation in the records of the treatment sources. Despite that such words as "fall" are not found, still it is notable that the term vertigo is found in the record and dizziness is found [in the record], all during the relevant period that begins 9/1/10. Imbalance is noted [I the record], and pre-syncopal episodes were noted [in the record]. Prior to this date, there are countless other citations to these symptoms, including the inpatient hospitalization that notably found an EKG showing an anteroseptal infarction, a condition that certainly is described in medical literature as involving ischemia and possible syncopal events.

Pl. Brief at 8-9 (citations to the record omitted).

At step two of the five-step sequential inquiry, the ALJ must determine whether the claimant has a medically severe impairment or combination of impairments. *See Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). An impairment is severe only if it significantly limits the claimant's physical or mental ability to do "basic work activities," *i.e.*, physical abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying or handling, or mental activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b); 416.921(b).

A "severe" impairment is distinguished from "a slight abnormality," which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of the claimant's age, education, or work experience. *See Bowen*, 482 U.S. at 149-51. The claimant has the burden of showing that an impairment is severe. *Bowen*, 482 U.S. at 146 n. 5. Moreover, objective medical diagnoses alone are insufficient to establish severity at step two; a claimant must also present evidence that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope with the mental demands of working. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007).

If a claimant has any severe impairment, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g), 416.920(d)-(g). A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two and all impairments are considered at step four when setting the residual functional capacity. *See* 20 C.F.R. §§

404.1523, 416.923 and 404.1545(a)(2), § 416.945(a)(2); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005); *Shannon v. Astrue*, No. 4:11-CV-00289, 2012 WL 1205816, at *10-11 (M.D. Pa. Apr. 11, 2012); *Bell v. Colvin*, No. 3:12-CV-00634, 2013 WL 6835408, at *8 (M.D. Pa. Dec. 23, 2013).

Ultimately, the outcome of the case depends on the demonstration of the functional limitations of the impairment. *See Alexander v. Shalala*, 927 F. Supp. 785, 792 (D. N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *accord*, *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006). Where the ALJ finds that Plaintiff suffers from even one severe impairment, any failure on the ALJ's part to identify other conditions as severe or precisely name the severe impairment does not undermine the entire analysis, when ultimately the ALJ properly characterized the symptoms and functional limitations. *See e.g.*, *Lambert v. Astrue*, No. Civ. A. 08-657, 2009 WL 425603, at *13 (W.D. Pa. Feb. 19, 2009); *Alexander v. Shalala*, 927 F. Supp. 785, 792 (D. N.J. 1995) *aff'd sub nom. Alexander v. Comm'r of Soc. Sec.*, 85 F.3d 611 (3d Cir. 1996); *Faircloth v. Colvin*, No. Civ.A.12–1824, 2013 WL 3354546, at *11 (W.D.Pa.2013), *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n. 2 (3d Cir. 2007); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("any error here became harmless when the ALJ reached the proper conclusion that [Plaintiff] could not be denied benefits conclusively at step two and proceeded to the next step");

*Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) ("[T]he ALJ considered any limitations posed by the [impairment] at Step 4 . . . any error that the ALJ made in failing to include the [impairment] at Step 2 was harmless").

### 1. Vertigo, Panic Attacks, and Asthma

The Court finds that Plaintiff failed to meet her burden to demonstrate that vertigo and asthma were severe impairments. *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). As mentioned above, a claimant must present evidence that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope with the mental demands of working. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521(a), 416.921(a); *see also Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 (3d Cir. 2007).

Substantial evidence supports the ALJ conclusion that anxiety, which include syncopal symptoms,[5] and asthma were not severe impairments. Although Plaintiff purported to limit her out-of-house activities due to agoraphobia-related panic attacks, the ALJ noted several contradictions in Plaintiff's testimony regarding Plaintiff's reported social limitations and her actual activities. For example the ALJ observed:

---

[5] Her primary care physician at Slate Family practice where she had been treated for over a decade stated in a record dated June 25, 2008, "I cannot help but wonder and I discussed this with her if her anxiety is tied to her vertigo. There is no way to prove it. I do have a reasonable suspicion that the two might be related. She is open to trying any option and I am going to switch her from Wellbutrin to Effexor XR . . . ." (Tr. 283). In a record dated August 8, 2011, plaintiff reported that the panic attacks occurred at night and dizziness is the first physical sign. (Tr. 548).

In social functioning, the claimant has mild difficulties. Claimant indicates she goes to her brother's, doctor's appointment, and food store yet indicates she goes nowhere on regular basis. She indicates that she does spend time with others; her grandkids won't come over, husband left and she has no friends (Exhibit IE). She reported to ReDCo providers that she does have friends which whom she has lunch (Exhibit l0F). Claimant testified she has limited interaction with family; does not have any friends; but did not have trouble getting along with co-workers and supervisors. The claimant is able to maintain a relationship with some friends. She was socially appropriate at the hearing. There is no indication in the evidence of record that claimant was other than socially appropriate with her treating and examining medical sources. The evidence supports a finding of mild limitations in social functioning.

(Tr. 29). The ALJ further observed:

> She has worked in a gas station, which invariably requires her to encounter co-workers and the public, yet she has not indicated difficulty with such contact. Panic and anxiety symptoms are not reported to providers with the frequency and severity indicated by claimant. She reports having friends to the consultative examiner. Claimant has repo1ted improvement in symptoms with medication.

(Tr. 34). Under 20 C.F.R. §§ 404.1571, 416.971, "a claimant's ability to work on a part-time basis may constitute probative evidence of his or her ability to perform the duties of a full-time job." *Henderson v. Astrue,* No. CIV.A. 10–1638, 2011 WL 6056896, at *6 (W.D.Pa. Dec.6, 2011); *see also Lyons v. Heckler*, 638 F.Supp. 706, 711 (E.D.Pa.1986) ("If a claimant performs work during any period in which she alleges that she was disabled, the work performed may demonstrate that she is able to engage in substantial gainful activity"); *accord Forster v. Colvin*, No. 3:13-CV-02699-GBC, 2015 WL 1608741, at *7 (M.D. Pa. Apr. 10, 2015).

The ALJ noted significant gaps in treatment, adequately addressed where insurance problems contributed to any gaps in treatment, and reasonably relied on the opinion of Dr. Bonita that Plaintiff's asthma and anxiety disorder were not severe impairments. (Tr. 77).

By Plaintiff's own admission the alleged vertigo-related symptoms have been transient. Pl. Brief at 8-9. Plaintiff has sought treatment for anxiety and alleged "undiagnosable" chronic vertigo since August 1998. (Tr. 276-426, 605-06). She had been working with this condition from as early back as August 1998 until October 2010, when she was fired for receiving stolen property. Moreover, the ALJ explained that the long time symptoms of anxiety, which include syncopal symptoms, and asthma are sporadic, the severity responds to treatment, and do not meet the durational requirements. (Tr. 28).

Based on the foregoing the ALJ's determinations that Plaintiff's anxiety, dizziness, and asthma were not severe impairments.

## B. RFC

Plaintiff argues that the ALJ erred in not including the following restrictions in Plaintiff's RFC: 1) difficulty performing numerical operations with accuracy and reasonable speed, according to Dr. Paul, the consultative psychologist (Tr. 472); 2) restriction on her ability to pick up coins, or to handle even larger items such as a broom, and to use her hands for gripping (Tr. 572, 574), reduced grip

strength (Tr. 573); 3) difficulty standing and walking for the required time for working the light range. She is lightheaded and dizzy, and the vertigo/dizzy/lightheaded symptoms she experiences remain, her primary care physician finds her limited to 1-2 hours of standing (Tr. 733); 4) Plaintiff cannot tolerate normal work stress, and experiences anxiety symptoms as well as panic (Tr. 278, 429), which Plaintiff asserts interferes with her ability to perform tasks in a timely manner in work settings; 5) Plaintiff cannot maintain attendance in an acceptable pattern, because her symptoms of asthma, carpal tunnel, anxiety, vertigo, depression and joint pains (particularly hand and wrist pain) combine to cause her erratic days and ill health that would not permit a predictable schedule (Tr. 736). Pl. Brief at 11-12.[6]

With regards to Plaintiff's assertion that the ALJ needed to include a limitation encompassing Plaintiff's difficulty performing numerical operations with accuracy and reasonable speed, as according to Dr. Paul (Tr. 472), the Court finds the argument unpersuasive. Dr. Paul observed that Plaintiff's "[c]oncentration was mildly impaired" given that "[s]he recalled 6 digits forward,

---

[6] Plaintiff further argues that the "ALJ erroneously states that "treating physicians have not suggested work-related limitation as severe as those alleged" and cites to a medical opinion from Plaintiff's primary care doctor, that indicated he last saw Plaintiff on August 2, 2012, with a date on the fax coversheet of October 19, 2012, well after the ALJ decision of May 24, 2012. (Tr. 732-36). As noted above, the Court will not consider the opinions and records submitted after the ALJ's decision. *Supra* note 3. Failure to adequately raise an issue results in its waiver. *See Kiewit Eastern Co., Inc. v. L & R Construction Co., Inc.*, 44 F.3d 1194, 1203–04 (3d Cir.1995) (upholding a district court's finding that a party had waived an issue when a party only made vague references to the issue).

3 backward and made errors during serial subtraction of 3 from 20 and did not recognize it," that Plaintiff's "[d]elayed verbal recall of 4 words after 10 minutes was mildly impaired," and that she "made errors on mental calculations but performed in the low average range" (Tr. 472). Dr. Paul ultimately concluded that Plaintiff had "mild concentration and memory problems and concrete reasoning" and was "capable of managing her own benefits and finances." (Tr. 473). The ALJ also noted that Dr. Paul indicated "no restrictions related to understanding, remembering and carrying out instructions." (Tr. 33). The ALJ also observed:

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. [Plaintiff] indicates she is able to pay bills, count change, handle a savings account, and use checkbook/money order; can pay attention for ½ hour; cannot handle stress and takes medication; but handles changes in routine well. [Plaintiff] does report difficulty with concentration and attention to her medical providers. . . .Her testimony was responsive, coherent, and without any apparent lapses in attention. The evidence supports a finding of moderate limitations in concentration, persistence and pace.

(Tr. 29) (citations omitted). Substantial evidence supports the ALJ's findings.

For restriction on her ability to pick up coins, or to handle even larger items such as a broom, and to use her hands for gripping (Tr. 572, 574), reduced grip strength (Tr. 573). The ALJ addressed this examination, noting:

> Treatment records from Dr. Kim's Rehabilitation LLC indicate evaluation in September and October 2011. In September 2011 claimant complained of . . . numbness in the hands and fingers in the lateral aspect of the hands which she noticed while working part time at a gas station. Examination findings noted . . . bilateral grip 4/5; finger abductors are 4/5 in strength bilaterally; negative Tinel signs,

and positive Phalen's test . . . and mild diminished pinprick sensation right hand medial compared to the left. X-rays and EMG studies were ordered. Mild degenerative joint disease was noted in the left and right wrist in October 2011. EMG/NCS in September 2011 was interpreted as abnormal consistent with a focal median neuropathy across the right wrist, mild, and suggestive of mild right carpal tunnel syndrome.

(Tr. 31-32) (internal citations omitted). Plaintiff fails to explain how these objective findings of mild symptoms supports a specific fingering limitation in the RFC, nor does Plaintiff direct the Court to any medical opinion stating that such a limitation is necessary.

With regards to Plaintiff argument that the ALJ erred in omitting a standing and walking restriction due symptoms of lightheadedness, vertigo, and dizziness, Plaintiff cites to an opinion that was submitted after the ALJ opinion and as explained in the note above, the Court will not remand this case for the ALJ to the consider the cited evidence submitted after the decision. Moreover, the Court previously found that substantial evidence supported the ALJ's decision regarding non-severe impairments, which included the vertigo impairment.

With regards to Plaintiff argument that the ALJ erred in omitting a restriction from normal work stress which aggravates her anxiety symptoms as well as panic (Tr. 278, 429), the Court previously found that substantial evidence supported the ALJ's decision regarding non-severe impairments, which included anxiety symptoms.

With regards to Plaintiff argument that the ALJ erred in omitting an

attendance restriction due to her combined impairments, Plaintiff cites to an opinion that was submitted after the ALJ opinion and as explained in the note above, the Court will not remand this case for the ALJ to the consider the cited evidence submitted after the decision, and the Court previously found that substantial evidence supported the ALJ's decision regarding non-severe impairments. .

The ALJ made a detailed and thorough assessment of the record and substantial evidence supports the RFC.

## C. VE Testimony

Plaintiff argues that the jobs cited by the VE are inappropriate, because they each require more skills or abilities that exceed her limitations. Pl. Brief at 13. Additionally, Plaintiff argues that the listed jobs descriptions initially given within the definitions of the Dictionary of Occupational Titles ("DOT") does not correlate to the listed job requirements in the "crosswalk." Pl. Brief at 13.

At step five, it is the Commissioner's burden to prove that there are jobs in the national economy that the Plaintiff can perform, given the impairments accepted by the ALJ. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000). If work a claimant can do "exists in the national economy"—that is, if "there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [his] physical or mental abilities and

vocational qualifications"—the claimant will not be considered disabled.  *See* 20

C.F.R. § 404.1566(b); *see also Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987)

(holding that 200 jobs in regional economy "is a clear indication that there exists in

the national economy other substantial gainful work which [claimant] can

perform."); *accord Russo v. Comm'r of Soc. Sec.*, No. CIV.A. 13-06918 FLW,

2014 WL 6991987, at *11 (D.N.J. Dec. 10, 2014).

The Third Circuit has explained that "objections to the adequacy of

hypothetical questions posed to a vocational expert often boil down to attacks on

the RFC assessment itself."  *Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d

Cir. 2005).  Where a plaintiff contends that the VE "testimony cannot be relied

upon because the ALJ failed to recognize credibly established limitations during

the RFC assessment and so did not convey those limitations to the vocational

expert," such are challenges to the RFC assessment itself.  *Rutherford v. Barnhart*,

399 F.3d 546, 554, n. 8 (3d Cir. 2005).

During the May 2012 hearing the ALJ posed the following hypothetical to

the Vocational Expert ("VE"):

> Let's assume further that I find from the credible evidence of record
> that our hypothetical claimant is capable of performing light work as
> that is defined by the Dictionary of Occupational Titles. However, our
> hypothetical claimant would be capable of occasional reaching
> overhead with the left non-dominant upper extremity, with no
> limitations below shoulder level, and no limitations with regard to use
> of the right dominant upper extremity. Our hypothetical claimant
> should never climb ropes, ladders, or scaffolds, but would be capable

of occasional climbing of stairs and ramps. Our hypothetical claimant should avoid concentrated exposure to environmental irritants such as dust, fumes, odors, and gasses. In addition, our hypothetical claimant would be capable of occasional use of the upper extremities or fine manipulation, but no limitation with regard to gross manipulation or grasping.

(Tr. 67-68). As explained above, the ALJ's RFC is supported by substantial evidence. Therefore, there is no error in the hypothetical which includes limitations of "occasional reaching overhead with the left non-dominant upper extremity, with no limitations below shoulder level, and no limitations with regard to use of the right dominant upper extremity" and "occasional use of the upper extremities or fine manipulation." *See Rutherford v. Barnhart*, 399 F.3d 546, 554, n. 8 (3d Cir. 2005).

With regards to the job descriptions, Plaintiff does not define the "crosswalk," the relevance of the "crosswalk," or cites to any authority as to why this resource should negate the VE testimony. Similarly unartful "crosswalk" arguments have been rejected by courts. *See e.g. Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447 & n.4 (2d Cir. 2012); *Leija v. Colvin*, No. 1:13-CV-1575 GSA, 2015 WL 1439933, at *6-7 (E.D. Cal. Mar. 27, 2015). The "crosswalk" is "a data-matching algorithm, 'to cross-reference the occupational detail for a particular DOT code to a SOC code [and then must] use the statistical data to define the number of jobs related to that DOT code.'" *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012).

While courts have determined that it is not error to use SOC codes,[7] Plaintiff does not cite to any case where it was error to use the DOT rather than the SOC. The Court finds a critique of the DOT in favor of using the SOC crosswalk in *Feeley v. Comm'r of Soc. Sec.*, where the court observed that the "Department of Labor itself now uses a more recent incarnation of the Dictionary of Occupational Titles called O*Net" and "O*Net seems to have replaced the Dictionary of Occupational Titles. The SSA may wish to reconsider its persistent reliance on the DOT in disability proceedings" given that the database is continually updated based on data collection efforts that began in 2001. *Feeley v. Comm'r of Soc. Sec.*, No. CIV. 14-4970 KM, 2015 WL 3505512, at *10-11 & n.2 (D.N.J. June 3, 2015). Notwithstanding this critique, the Court in *Feeley* ultimately determined that the crosswalk only eliminated one job as obsolete while the other jobs identified in the DOT remained. *Feeley v. Comm'r of Soc. Sec.*, No. CIV. 14-4970 KM, 2015 WL 3505512, at *10-11 & n.2 (D.N.J. June 3, 2015). In this instance, the DOT is the only resource consulted in the hearing and Plaintiff does not argue that any of the jobs identified by the VE are obsolete. The ALJ gave the VE a hypothetical and

---

[7] The court in *McKinnon v. Comm'r of Soc. Sec.*, found that "[e]ven though the SOC is not specifically listed [in 20 C.F.R. § 404.1566(d)], the SOC qualifies as "reliable job information available from various governmental and other publications." *McKinnon v. Comm'r of Soc. Sec.*, No. CIV. 12-4717 NLH, 2013 WL 5410696, at *5 (D.N.J. Sept. 26, 2013); *see also Porter v. Colvin*, No. CIV. 14-4004 RBK, 2015 WL 1969086, at *17 (D.N.J. Apr. 30, 2015); *James v. Astrue*, No. CIV.A. 11-253, 2011 WL 7143113, at *25 (E.D. Pa. Dec. 27, 2011) *report and recommendation adopted*, No. 11-CV-253, 2012 WL 346676 (E.D. Pa. Feb. 3, 2012).

specified abilities consistent with the DOT. (Tr. 67-68). The VE listed jobs which correlated with the DOT (Tr. 68-70) and Plaintiff's attorney never asked the VE to address the job descriptions using the "crosswalk" or SOC. (Tr. 70).

The Court finds that the ALJ did not err in relying on the VE testimony and that substantial evidence supports the ALJ's step five determination of jobs available to Plaintiff.

### D. Allocation of Weight to Medical Opinions

Plaintiff argues that the ALJ erred by disregarding the report of Dr. Paul, a clinical psychologist who examined Plaintiff and erred by giving weight to the report of Drs. Rohar and Bonita who never saw her. Pl. Brief at 15-18. Plaintiff also argued that the ALJ erred by giving weight to Plaintiff's GAF scores since GAF scores "have most recently been discredited as a reliable tool to assess severity of psychiatric symptoms." Pl. Brief at 15. Plaintiff also states that the "ALJ cites a score of 70 from Dr. Matta's evaluation of 2009, which is obviously outside the relevant period, and has no bearing on the matter of how Ms. Gartland functioned after 9/1/10, the alleged onset date."[8] Pl. Brief at 16 (internal citations omitted).

///

---

[8] The Court notes that Plaintiff also argues for consideration of a hospitalization in 2008 stating that "[w]hile this hospitalization is outside the relevant time period, [Plaintiff's] cumulative record is available to the court, so that it is clear that her medical problems have been ongoing for years." Pl. Brief at 8.

## 1. Weight to Opinions of Drs. Paul and Rohar

The weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. §§ 404.1527(c); 416.927(c). Section 404.1527(c) and 416.927(c) establish the factors to be considered by the ALJ when the opinion of a treating physician is not given controlling weight. Subsection 404.1527(c)(2) differentiates among treating relationships based on the length of the treating relationship and the nature and extent of the treating relationship. Subsection (c)(3) provides more weight to opinions that are well supported, which means that "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." Subsection (c)(4) states that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." Subsection (c)(5) provides more weight to specialists, and subsection (c)(6) allows consideration of other factors which "tend to support or contradict the opinion." 20 C.F.R. §§ 404.

Additionally, an ALJ is entitled to credit parts of an opinion without crediting the entire opinion. *See Lee v. Comm'r Soc. Sec.*, 248 F. App'x 458, 461 (3d Cir. 2007) (Upholding the findings of the ALJ where the ALJ had afforded

"great weight" to the opinions of treating physicians, but did not "fully credit" them where there were treatment gaps in their records that undermined Plaintiff's claimed severity); *Carter v. Comm'r of Soc. Sec.*, 511 F. App'x 204, 205-06 (3d Cir. 2013) (Upholding the findings of the ALJ where the ALJ afforded treating physician "great weight" but discounted statement that claimant was unable to work where progress notes failed to lend support for that statement).

To understand the ALJ's reasoning for rejecting medical opinions that heavily rely on Plaintiff's subjective report of history of symptoms, it is necessary to evaluate the ALJ's explanation for concluding that Plaintiff's allegations were "not fully credible." (Tr. 34). The ALJ explained:

> The medical evidence indicates that [Plaintiff's] examination findings, treatment recommendations, and her activity level are such that the residual functional capacity based on those factors would not prevent her from engaging in meaningful work activity. [Plaintiff] testified she trips and falls all the time, yet this is not indicated in the medical evidence. She testified she was told to use a cane or walker, yet this recommendation is not confirmed in the medical evidence, and medical providers in October 2011 note she ambulates without any assistive device or gait deviation. She has worked in a gas station, which invariably requires her to encounter co-workers and the public, yet she has not indicated difficulty with such contact. Panic and anxiety symptoms are not reported to providers with the frequency and severity indicated by [Plaintiff]. She reports having friends to the consultative examiner. [Plaintiff] has reported improvement in symptoms with medication. [Plaintiff] does not report significant medication side effects which would affect her functioning. [Plaintiff] has treated at times on a consistent basis and has been evaluated by specialists. Nevertheless, there are gaps in treatment which [Plaintiff] attributes to financial issues. Examination findings routinely note normal reflexes and motor strength. No significant neurological

deficits are noted. Mental status examination findings are not significantly abnormal. [Plaintiff] has not required any inpatient hospitalizations or frequent emergency room visits related to her physical or mental symptoms. It appears that her self-imposed limitations exceed the actual limitations which are supported by objective findings and findings on diagnostic studies. Treating physicians have not suggested work-related limitations as severe as those alleged by [Plaintiff].

(Tr. 34). The Court finds that the ALJ evaluated the evidence in totality and his credibility determination is supported by substantial evidence. In the psychological evaluation with Dr. Paul Plaintiff reported having "attacks" involving sudden unpredictable anxiety symptoms, vertigo, nausea, chest pain, shortness of breath, heart palpitations which last sometimes up to an hour. (Tr. 470). Plaintiff reported that she stays home in order to avoid having an attack in public. (Tr. 470). In the past, she has had to leave early from work and had recently restricted her usual activities because of her symptoms. (Tr. 470). Dr. Paul diagnosed Plaintiff with mood disorder NOS, by history and panic disorder with agoraphobia. (Tr. 472). As to Plaintiff's prognosis, Dr. Paul explained that she:

presents with . . . severe anxiety and moderate depression in response to her physical, social and work situation. She has a longstanding history of anxiety, depression and panic symptoms which have worsened over the past year.

(Tr. 472). With regards to weight allotted to medical opinions, the ALJ stated that he:

gives no weight to the assessment of functioning and diagnosis of panic attacks provided by [Dr. Paul] in June 2011. This assessment and diagnosis is not supported by the evidence of record including the mental status examination findings reflected in the record and by the consultative examiner. [Plaintiff] does not report the frequency of panic attacks to her mental health providers nor has she been diagnosed with panic attacks at either Muhlenberg Behavioral or at the ReDCo group. Dr. Paul appears to rely on an assessment of limitations resulting from a panic impairment for which there are no objective medical evidence and/or which rely upon only the claimant's subjective complaints, and therefore without substantial support from the evidence of record.

(Tr. 34-35) (citations omitted). The ALJ observed that Plaintiff for the first and only time reported that her panic attacks would last sometimes up to an hour, that she stays home in order to avoid having an attack in public, that she has had to leave early from work, and had recently restricted her usual activities because of her symptoms. The ALJ also contrasted what Plaintiff reported to Dr. Paul with her demeanor during the hearing and her testimony regarding her ability to socialize and do activities outside the home without panic symptoms. Substantial evidence supports the ALJ's credibility determination of Dr. Paul.

The ALJ also determined that:

[Dr. Rohar in the] Psychiatric Review Technique assessed [Plaintiff]'s anxiety disorder as non-severe, and her affective disorder as resulting in mild degree of limitation in activities of daily living, moderate limitations in maintaining social functioning and maintaining concentration, persistence and pace, and no episodes of decompensation.

[Dr. Rohar] found [Plaintiff] could carry out short and simple instructions; make simple work related decisions; is able to maintain

socially appropriate behavior; and that the limitations resulting from the impairment do not preclude the [Plaintiff] from performing simple, routine work. The undersigned gives great weight to these assessments as they are consistent with the evidence of record and the findings in this decision that [Plaintiff] is capable of performing other work despite the limitations resulting from her impairments. The undersigned gives no weight to the assessment of moderate limitations related to social functioning including working in proximity to others, dealing with the general public, and getting along with co-workers, because such limitations are not supported by the evidence of record. The undersigned gives no weight to [Dr. Rohar's opinion that Plaintiff's] affective disorder is not severe as this is not supported by the evidence of record.

(Tr. 36). Given that Dr. Rohar reviewed the medical record and was able to evaluate the longitudinal scope of Plaintiff's mental impairments, substantial evidence supports the ALJ's according great weight to the opinion of Dr. Rohar over the opinion of Dr. Paul.

In this instance, the ALJ thoroughly explained his reasoning that Plaintiff was not fully credible, particularly as to why the ALJ found that Plaintiff's report of the severity and frequency of her panic attacks were not credible. Substantial evidence supports the ALJ's determination that to the extent that the opinion of Dr. Paul relied on Plaintiff's subjective report which the ALJ found not credible, Dr. Paul's opinion would be accorded little weight. Substantial evidence supports the ALJ's credibility determinations.

///

///

## 2. GAF Score

"While we agree . . . that the consideration of GAF scores has changed and they are no longer used, here they are evidence of record which were appropriately used at the time. Therefore the ALJ should have addressed them . . . ." *Wheeler ex rel. J.B. v. Colvin*, No. 3:14-CV-524, 2014 WL 4672496, at *23 (M.D. Pa. Sept. 18, 2014); *see also Forster v. Colvin*, No. 3:13-CV-02699-GBC, 2015 WL 1608741, at *9 (M.D. Pa. Apr. 10, 2015) (finding now error where the ALJ accounted for the GAF scores in addition to evidence from medical source opinions, testimony, a plaintiff's activities of daily living, and the record as a whole, and the ALJ did not place a disproportionate or dispositive weight to the plaintiff's GAF scores). The Court finds no error in the ALJ's reliance in the GAF scores in this instance.

## 3. Evidence Prior to Disability Onset

An ALJ is not obligated find evidence prior to the onset date to be relevant or probative. *See Giese v. Comm'r of Soc. Sec.*, 251 F. App'x 799, 804 (3d Cir. 2007) (Finding no error where ALJ excluded evidence prior to the onset date and adequately explained why the ALJ did not afford substantial weight to evidence prior to onset); *Ward v. Shalala*, 898 F. Supp. 261, 263 (D. Del. 1995) ("While evidence of [Plaintiff's] condition prior to the onset date and after the insured date is to be considered by the ALJ in furtherance of evaluating whether the applicant

qualifies for benefits, the period between onset of disability and expiration of insured status is the focus of the inquiry"); *accord McKean v. Colvin*, No. 1:13-CV-2585, 2015 WL 1201388, at \*5 (M.D. Pa. Mar. 16, 2015).[9]  However, as the Court in *O'Donnell v. Astrue* observed, the mere fact that evidence exists prior to disability onset does not automatically mean that such evidence is not relevant. *See O'Donnell v. Astrue*, No. CIV.A. 10-1478, 2011 WL 3444194, at \*7 at n.7 (W.D. Pa. Aug. 8, 2011); *accord McKean v. Colvin*, No. 1:13-CV-2585, 2015 WL 1201388, at \*5 (M.D. Pa. Mar. 16, 2015).  The ALJ did not err in considering evidence prior to Plaintiff's alleged onset date and such consideration is useful in assessing a longitudinal history of Plaintiff's condition and what impairments coexisted with her ability to work prior to the alleged onset, whether her condition deteriorated, or whether symptoms were momentary exacerbations that resolved, or momentary remission.  *See McKean v. Colvin*, No. 1:13-CV-2585, 2015 WL 1201388, at \*4-5 (M.D. Pa. Mar. 16, 2015).

///

///

///

///

///

---

[9] The Court also notes that an ALJ has a duty to develop the record "for at least the 12 months preceding the month" in which a claimant files an application "unless [claimaint's] disability began less than 12 months before [filing the] application."  20 C.F.R. § 404.1512 (d).

**IV.    Conclusion**

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence.  Accordingly, the Court will affirm the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).

An appropriate Order in accordance with this Memorandum will follow.


Dated: September 28, 2015                    _____s/Gerald B. Cohn_____
                                             GERALD B. COHN
                                             UNITED STATES MAGISTRATE JUDGE